## Kentucky West Virginia Gas Co. v. Preece et al.
### (Decided June 18, 1935.)

COMBS & COMBS for appellant.

S. S. WILLIS and JOHN T. DIEDERICH for appellees.

OPINION OF THE COURT BY JUDGE REES—Reversing.

This is an action to recover money alleged to have been paid under a mistake of law. The circuit court denied the plaintiff the relief sought by it and it has appealed.

On December 14, 1926, Alex Preece and his wife, Jane Preece, by two separate instruments leased to the Ivyton Oil & Gas Company and R. J. Graf the oil and gas rights in two tracts of land, one of 187 acres, owned by the wife, and the other of 12 acres, owned by the husband. The two leases were identical in terms and were for twenty years and as much longer as oil or gas was produced in paying quantities. The lessees agreed to pay to the lessors $300 per year for each gas well and one-eighth of the oil. They further agreed to commence a well on the land by January 1, 1927, or thereafter to pay the lessor at the rate of $1 per acre per annum payable each three months in advance until such well was completed or the lease was surrendered. The lease contained a surrender clause conditioned upon the payment of $1 and all accrued rentals and royalties. Shortly after the leases were executed, they were assigned by the lessees to the appellant, Kentucky West Virginia Gas Company.

On January 9, 1933, appellant availed itself of the surrender clause and then brought this action to re-

cover the amount of rentals which it had paid. No well was drilled on either tract of land and the specified rentals were paid up to the date the lease was surrendered. The payments amounted to $60 on one of the leases and $935 on the other. In its petition the plaintiff alleged that by the leases executed December 14, 1926, the defendants warranted generally their title to all the oil and gas in and under the tracts of land described and that the lessees never drilled any wells on either of the tracts of land, but in lieu of drilling paid delay rentals as provided in the leases in the total amount of $995. It was further alleged that on April 14, 1890, the predecessors in title of the defendants sold and conveyed to one Arthur D. Bright, trustee, "all the coal, salt water, and minerals of every description, in, upon, and under 325 acres of land located on Rock House Fork in Martin County, Kentucky," which embraced all of the lands described in the two leases from the defendants to the Ivyton Oil & Gas Company and R. J. Graf; that the deed from defendants' predecessors in title to Arthur D. Bright, trustee, in addition to conveying the minerals therein described, "also granted and conveyed the full and complete rights and privileges of every kind for mining, manufacturing and transporting such coal, salt water and minerals on, through and over said premises, and in particular the right of exploring for and extracting the said minerals, and also with full rights to, from and over said premises by the construction and use of roads, tramways, railroads or otherwise for the purpose of exploring, extracting, storing, handling, manufacturing, refining, shipping or transporting all said minerals whether contained on the said premises or elsewhere." It was alleged that by this deed Arthur D. Bright, trustee, acquired title to all the oil and gas rights in the two tracts of land in question and that consequently the defendants had no title to the oil and gas rights in the land at the time they executed the leases to the Ivyton Oil & Gas Company and R. J. Graf.

The rights acquired by Arthur D. Bright, trustee, were subsequently conveyed to the Federal Gas, Oil & Coal Company, which leased the oil and gas rights to the Warfield Natural Gas Company on January 1, 1929, for a term of ten years or as long thereafter as oil or gas was produced in paying quantities.

When the defendants leased the land to the Ivyton Oil & Gas Company and R. J. Graf, the lessees employed a competent and experienced attorney of Salyersville to examine the title of the defendants to the oil and gas rights in the land and he reported that the mineral deed executed on April 14, 1890, by the defendants' predecessors in title to Arthur D. Bright, trustee, did not cover or embrace the oil and gas in the lands in question and that in his opinion the defendants were the owners of the oil and gas rights. The plaintiff continued to pay the delay rentals until it learned that the Warfield Natural Gas Company held a lease from the Federal Oil, Gas & Coal Company covering the same oil and gas rights when it sought further legal advice as to the validity of its leases. It was advised by its attorney that the deed to Arthur D. Bright, trustee, operated to pass the oil and gas rights in the lands described in the deed, which included the two tracts embraced in the two leases from the defendants, and that the defendants had no title to the oil and gas in the land when they executed the leases.

It alleged that it paid the delay rentals amounting to $995 by reason of mutual mistake on the part of the defendants and itself, both parties mutually believing at the time the payments were made that the defendants had good and marketable title to the oil and gas rights at the time they executed the leases. A demurrer to the petition was sustained and, the plaintiff having declined to plead further, its petition was dismissed.

The deed executed April 14, 1890, to Arthur D. Bright, trustee, by the then owners of the fee undoubtedly conveyed the oil and gas along with all other minerals. The word "minerals" in a deed embraces oil and gas unless the language of the deed discloses an intention to exclude them. Scott v. Laws, 185 Ky. 440, 215 S. W. 81, 13 A. L. R. 369. In Hudson & Collins v. McGuire, 188 Ky. 712, 223 S. W. 1101, 17 A. L. R. 148, the deed there in controversy conveyed "all of the minerals [except stone coal], with necessary right of ways and privileges for prospecting, mining and smelting," and it was held that the words "mining and smelting" have no place in a grant of oil or gas rights or privileges, and their use, as well as the absence of suitable words to show that oil or gas was intended to

be conveyed, rendered the deed sufficiently ambiguous to admit extrinsic evidence as to the intention of the parties to the instrument. It was stated in the course of the opinion that in the absence of restrictive words a conveyance of ''minerals'' will include oil and gas. In the deed to Bright, trustee, there was no restrictive language which indicated that it was the intention of the parties to exclude oil and gas. The deed conveyed ''all the coal, salt water, and minerals of every description in, upon, and under'' the land and granted to him the right to use the land ''for the purpose of exploring, extracting, storing, handling, manufacturing, refining, shipping or transporting all said minerals.'' Not only did the deed fail to use restrictive language showing that it was intended to exclude oil and gas, but many of the terms used in the deed were peculiarly applicable to these minerals. The conclusion is inescapable that the deed to Bright dated April 14, 1890, conveyed the oil and gas, and consequently that appellees had no title to these minerals when they executed the two leases to appellant's assignors.

The question to be determined, therefore, is: Can the appellant recover the rentals that have been paid by it under the two leases? Appellees argue that appellant, having bargained for the right to prospect for oil and gas on their land and having enjoyed that right for the period desired, is plainly precluded from going back and reclaiming the money it paid since it cannot restore what it got. The flaw in this argument is the appellant got nothing. The right for which it bargained and paid belonged to another and appellees, by their deeds, conveyed no rights to appellant. All of the payments made were without consideration. In support of their contention that appellant cannot recover, appellees rely upon a line of authorities, mostly from foreign jurisdictions, which hold that a mistake of law, without any accompanying circumstances of fraud or misrepresentation, constitutes no basis for relief at law or in equity. The rule in most jurisdictions is that money paid under a mistake of fact can be recovered, but money paid under a mistake of law cannot be recovered, but, as pointed out in Spalding v. City of Lebanon, 156 Ky. 37, 160 S. W. 751, 49 L. R. A. (N. S.) 387, to this general rule the decisions of this court form an exception since it has long been settled in this state that

money paid under a mistake of law may be recovered. As said in 21 R. C. L. 172:

"Since it is contended by the authorities supporting this rule that a person is much more likely to make a mistake of law than a mistake of fact, the wisdom of the rule would seem apparent."

The rule long followed in this state is stated thus in Supreme Council C. K. A. v. Fenwick, 169 Ky. 269, 183 S. W. 906, 910:

"It is the settled rule in this state, adopted at an early date and followed by a long line of decisions, that whenever, by a clear or palpable mistake of law or fact essentially bearing upon and affecting the contract, money has been paid without consideration, which in law, honor, or conscience was not due and payable, and which in honor or good conscience ought not to be retained, it may and ought to be recovered. Ky. Title Saving Bank & Trust Co. v. Langan, 144 Ky. 46, 137 S. W. 846; Ray & Thornton v. Bank of Kentucky, 3 B. Mon. 510, 39 Am. Dec. 479; Titus v. Rochester German Insurance Co., 97 Ky. [567] 574, 31 S. W. 127, 17 Ky. Law Rep. 385, 28 L. R. A. 478, 53 Am. St. Rep. 426; Gratz v. Redd, 4 B. Mon. 178; McMurtry v. Kentucky Central R. R. Co., 84 Ky. 462, 1 S. W. 815, 8 Ky. Law Rep. 455. In such a case, it is not necessary to allege a mistake in express terms. It is only necessary to allege the facts, from which the conclusion of mistake inevitably follows."

Probably the earliest statement of the rule by this court is found in Underwood v. Brockman, 4 Dana, 309, 29 Am. Dec. 407, where Chief Justice Robertson said:

"Can there, upon principle, or even policy, be any doubt, that if, without any other consideration, good or valuable, moral or legal, than an erroneous opinion that he is legally bound, A shall have paid, or assumed to pay, B money, he would, in conscience, and in judgment of law, be entitled to restitution or exoneration? If he had paid, upon what principle of law or ethics, could B claim the right to hold? Or if he had only agreed to pay, why should the law compel payment? Ignorance of law, of either the civil or the moral code, should not excuse a rational being from the prescribed respon-

sibility for a voluntary violation of it; because, so far as civil and moral conduct may be concerned, it is the duty of every intelligent citizen and moral agent to know the law and his own obligations, and no government, moral or political, could prevail or be upheld, if the plea of voluntary ignorance would excuse an infraction of its prescribed rules of conduct. Universal anarchy and licentiousness would be the natural consequence of allowing such a defense to be sufficient to entitle the offender to impunity.

"But the same reasoning does not apply to contracts, or to private rights. It is well known, that all persons do not understand some of the plainest rules of law, and that no person, however enlightened, knows all the law. And if one, ignorant of a plain principle of law, shall, without any other motive or consideration than an erroneous opinion respecting his legal rights and obligations, release a right, pay money, or undertake to do any act, what principle of law, or dictate of justice or policy, would require him to be bound, as with a Gordian knot, which nothing· but the sword could loose?

"Why should he be punished in such a case, for such ignorance? Or why should the other party be enriched or benefited, without any equivalent or merit of any kind or to any extent whatsoever? A mistake of fact might be sufficient to entitle to relief or exoneration, because such a mistake would show, that the contract was not such as the parties, or at least one of them, contemplated or would have made, had there been no mistake. Might not a mistake as to the law, in a parallel case, be equally availing, and for precisely the same reason? Undoubtedly it might, and, as we think, should; and such we understand to be the rational and consistent doctrine of the common law established in Kentucky."

A reference to the following additional citations shows the doctrine has been consistently approved and applied by this court: Kentucky Title Savings Bank & Trust Co. v. Langan, 144 Ky. 46, 137 S. W. 846; City of Lebanon v. Humkey, 161 Ky. 454, 170 S. W. 1172;

608

Lichtwadt v. Murphy's Administrator, 182 Ky. 490, 206 S. W. 771; Robertson v. Jefferson County, 205 Ky. 479, 266 S. W. 27; Bituminous Casualty Exchange v. Ford-Elkhorn Coal Co., 243 Ky. 456, 48 S. W. (2d) 1057; Ziedman & Pollie, Inc., v. City of Ashland, 244 Ky. 279, 50 S. W. (2d) 557; River Excursion Co. v. City of Louisville, 244 Ky. 811, 51 S. W. (2d) 470; Allen Lumber Co. v. Howard, 254 Ky. 778, 72 S. W. (2d) 483; Vinaird v. Bodkin's Adm'x, 254 Ky. 841, 72 S. W. (2d) 707; Great A. & P. Tea Co. v. City of Lexington, 256 Ky. 595, 76 S. W. (2d) 894.

If the averments of the petition are true, the appellant made the payments which it seeks to recover in the mistaken belief that appellees had a marketable title to the oil and gas in the land covered by the lease. The appellees warranted their title to the oil and gas rights and the payments were made in good faith by the appellant. No elements of estoppel appear, nor do the facts stated in the petition tend to show the existence of fraud which would preclude the appellant from recovering though the payments were made under mistake either of fact or law. It paid money to appellees without consideration which was not due and payable and which in honor and good conscience ought not to be retained.

We think the circuit court erred in sustaining the demurrer to the petition, and the judgment accordingly is reversed with directions to overrule the demurrer.